## LLOYD NEUSBAUM *v.* STATE OF MARYLAND.
### [No. 32, October Term, 1928.]

*Decided December 7th, 1928.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Jere J. Santry,* for the appellant.

*J. Hubner Rice, Assistant Attorney General,* and *William H. Maynard, Assistant State's Attorney for Baltimore City,* with whom were *Thomas H. Robinson, Attorney General,* and *Herbert R. O'Conor, State's Attorney for Baltimore City,* on the brief, for the State.

152

OFFUTT, J., delivered the opinion of the Court.

Lloyd Neusbaum was indicted, tried, and convicted, of the crime of manslaughter, in the Criminal Court of Baltimore City, and upon his conviction sentenced to thirty days in jail. From that judgment he has appealed.

The record shows that about eleven thirty o'clock on the night of December 7th, 1927, William Powell, while in the act of crossing Ostend Street at a point near Cleveland, in Baltimore City, was struck and killed by an automobile which was being rapidly driven "down" that street. The night was rainy, the street surface was slippery, and it was hard to "observe anything." The driver of the automobile did not stop, but proceeded east on Cleveland Street to Cross Street, turned north on that street, and escaped. For some reason not disclosed by the record, the police suspected that Neusbaum was driving the machine at the time of the collision, and he was arrested, charged with running Powell down, and subsequently indicted for manslaughter on the theory that Powell had been killed as a result of Neusbaum's criminal negligence in the operation of the car which struck him.

The indictment was filed on December 23rd and, on the 10th of the following January, Neusbaum demanded the particulars of the indictment and, on January 13th, he demurred to it. On January 16th the court granted his demand for the particulars of the indictment, but overruled his demurrer.

The bill of particulars appears to have been filed at or about the time that the case was called for trial, and defendant asserts in his brief that he asked for a postponement, which the court refused. He then demurred to the bill of particulars, and, after the demurrer was overruled, he filed the general issue plea to the indictment and the case proceeded to trial. He elected to be tried before a jury, and, during the process of selecting the jury, the assistant state's attorney, in the presence of certain jurors who had been accepted as members of the special panel, speaking to others who were waiting to be examined on their *voir dire*, said, referring to the defendant and another jointly indicted with

him, "these men are hit and run drivers." The defendant objected to that remark and moved that a juror be withdrawn and the case continued. That motion was denied, and the examination of the jurors on their *voir dire* was resumed, and that ruling is the subject of the first exception. But before the panel was completed the State amended its bill of particulars, and the defendant again asked for a continuance, which was refused. The court then ordered a re-arraignment of the defendant and offered him the "right to strike a new jury although the present panel has not been sworn or completed." Counsel for the defense declined the offer and announced that "the eleven jurors previously examined and accepted were satisfactory to the defense." The defendant was then re-arraigned, a plea of not guilty entered, and the trial proceeded. During the course of it the defendant reserved ten exceptions referring to rulings on questions of evidence, and those rulings, together with the ruling on defendant's motion to discharge the jury and continue the case because of the statement of the assistant state's attorney referred to above, and the rulings of the court on the demurrers to the indictment, are presented by the appeal for review in this court.

The indictment is in the following form: "The jurors of the State of Maryland, for the body of the City of Baltimore do on their oath present that Jerry Jones and Lloyd Neusbaum, late of said city, on the seventh day of December, in the year of our Lord, nineteen hundred and twenty-seven, at the city aforesaid, feloniously and negligently did kill and slay William Powell, contrary to the form of the Act of Assembly in such case made and provided and against the peace, government and dignity of the State." The only difference between that form and the form prescribed by section 563 of article 27 of the Code, is that it adds to the word "feloniously," found in the Code form, the word "negligently." The demurrer to it involved these propositions, (1) that it shows a misjoinder of defendants, (2) that it fails to charge any definite duty upon either defendant and fails to notify either of them of the particular act of negligence

154

charged against them, (3) that it charged them with an illegal measure of care and diligence, and (4) that the indictment "charges upon the defendants a criminal responsibility for the alleged commission of a joint or common wrong, but does not charge that there was an exclusive duty upon any one of the defendants in respect to the happening of the accident."

The first objection may be dismissed without further comment than this, that the indictment does charge both defendants with the joint commission of a single unlawful act, to wit, the felonious and negligent killing of a human being, and since such act could be and was alleged to be the joint act of two persons, it was not error to join them in the same indictment. 1 *Whart. Cr. Proc.*, par. 351.

The other objections considered together amount to no more than this, that the indictment fails to identify and describe the offence charged against the defendants with such precision and particularity as would apprise them of the specific crime of which they were accused, and that therefore it was in violation of article 21, Maryland Bill of Rights, which provides that "in all criminal prosecutions, every man hath a right to be informed of the accusation against him," and of the Fourteenth Amendment to the Federal Constitution, which prohibits any state from making or enforcing any law abridging the privileges or immunities of citizens of the United States, or from depriving any person of life, liberty, or property without due process of law.

The indictment, as has been noted, follows the statute, except that it adds the word "negligently" to the word "feloniously," but in all other respects the two are identical. So that the objection goes not only to the indictment in this case, but to the statute, and it becomes necessary to ascertain the nature of the crime of manslaughter and its constituent elements to determine whether the statutory form is sufficient (1) to notify the accused of the crime with which he is charged, and (2) whether the addition of the word "negligently" alters, contradicts, or enlarges the significance of the

word "feloniously," and if it does whether it vitiates the indictment.

Manslaughter has been defined to be "the unlawful and felonious killing of another, without malice aforethought, either express or implied, and is either voluntary or involuntary homicide, depending upon the fact whether there was an intention to kill or not." (1 *Wharton Cr. Law*, par. 421.) A felonious homicide is where one takes the life of another human being "purposely and without legal excuse, or without such excuse takes it unintentionally while needlessly doing anything in its nature dangerous to life, or who causes death by neglecting a duty imposed either by law or by contract, or in the course of committing a crime or even a civil wrong. Life, however, must be actually taken. The law protects human life by punishing as a felon one who, whether purposely or by want of due care or of due attention to legal or contractual duties, does or omits what results in the death of another. The wrong must have attained the law's standard of magnitude, ascertainable only on examinations and comparisons of our past judicial records." 2 *Bishop on Cr. Law*. par. 629. So that the elements of the offence are (1) the killing of one human being by another (2) unlawfully, but (3) without malice. And the principal distinctions between that offence and murder at common law are (1) the absence of malice, and (2) that, after 23 *Henry VIII*, c. 1, par. 3, murder was excluded from a benefit of clergy. *Ibid*. par. 627, sec. 2.

At common law it was essential that the indictment should show the name of the person charged, the name of the person killed, the jurisdiction within which and the time at which the homicide occurred, that it was felonious and such of the facts and circumstances incident to the crime as were reasonably necessary to identify it, and to enable the court to see whether a crime had been committed as charged. *Wharton Cr. Proc.*, ch. 16. Measured by that standard, the indictment in this case would unquestionably be defective, but that is not the question involved here, which is, whether the indictment in this case conforms to the statute, and (2), whether the

statute itself is valid. If the form prescribed by the statute is sufficient to inform the defendant of the "accusation against him," it does not violate article 21 of the Bill of Rights, and consequently is not repugnant to the "due process" clause of the Fourteenth Amendment of the Federal Constitution.

It is said in 31 *C. J.* 651, that "it is within the power of the legislatures under such a constitutional provision to prescribe the form of the indictment or information, and such form may omit averments regarded as necessary at common law. But the legislature, while it may simplify the form of an indictment or information, cannot dispense with the necessity of placing therein a distinct presentation of the offense containing allegations of all its essential elements." So far as it goes, that statement is correct, and we know of no authority to the contrary, but the difficulty lies in applying the formula "all essential elements," to the facts of a given case. Was it sufficient in this case, for instance, to say that the defendant negligently and feloniously killed William Powell at Baltimore City, or was it necessary to add that the homicide occurred on Ostend Street near Cleveland in the city of Baltimore, and was caused by the gross negligence of the defendant in the operation of an automobile which he was then and there driving? It has been held that the allegation of place is sufficient if it shows the case to be within the jurisdiction of the court (31 *C. J.* 677, par. 20B), so that the only question is whether it was necessary to allege the manner and means of the killing. The statute expressly says that it was not. Code, art. 27, sec. 563. And unless the manner and means of death were essential elements of the crime of manslaughter, allegations as to them were not required in order to inform the accused of the accusation against him as required by article 21, Declaration of Rights.

The question is by no means free from doubt, for while ordinarily the manner and means of death are mere incidents and form no part of the crime itself, yet it is quite possible that cases might occur when the bald charge that one at a certain time at a certain city feloniously killed an-

other would afford him practically no information upon which he might base his defence. If in fact he had killed the person named in the indictment, he would naturally know of the circumstances, but if he had not, it might become of the utmost importance for him to know how and by what means the homicide occurred, and the indictment would furnish him no information as to those facts at all. But that difficulty is met to some extent by the rule which allows the defendant the right to demand of the State the particulars of the offense with which he is charged, where the indictment is so general that it discloses no information sufficient to afford him a fair and reasonable opportunity to meet it and defend himself. Wharton Cr. Proc. par. 1637. And that right was recognized by this court in *Lanasa v. State,* 109 Md. 612, and while such a motion or demand is addressed to the discretion of the court, nevertheless it is a sound discretion and may be reviewed where there is a gross abuse of it resulting in injury to the accused.

And it may be added that, wherever the precise question now under consideration has arisen, the right of the legislature to prescribe a short form of indictment such as that provided by Code, art. 27, sec. 563, has been upheld, sometimes on the ground that the defendant's right to have the particulars upon demand protected him against injury, and at others on the ground that the manner and means of death were not elements of the crime of manslaughter, and that allegations as to them were not necessary to inform the prisoner of the accusation against him.

Statutes similar in character to that now under consideration have been enacted in many of the American states as well as in England, in an effort to escape the excessive formalism of the common law, which formerly made the conviction or acquittal of one charged with crime so often turn upon some technical quibble rather than upon the guilt or innocence of the accused, and the uniform tendency of the courts has been to uphold them whereever that could be done without infringing the right of the accused to the protection of such constitutional guarantees, as the right to be informed of the

charge against him. So that, while there have been cases in which such statutes have been held bad, they were nearly always cases where the statute failed to require such a statement of the offence as would certainly identify it, as in *Goeller v. State*, 119 Md. 61, where the defendant was convicted of selling liquor on Sunday upon an indictment charging that offense alone, but was sentenced as a second offender upon the authority of a statute which dispensed with the necessity for alleging in the indictment that the crime charged was a second offense, or *State v. Silverman*, 76 N. H. 309, where it was held that a statute which dispensed with the necessity of describing the property taken in an indictment for embezzlement was bad. But such cases proceed upon the theory that the omissions allowed by the statute are essential elements of the crime, and are not authority for the proposition that a statement of the manner and means by which the crime was committed are essential, but on the contrary the rule seems to be that such allegations are not essential except where the manner in which or the means by which the act is done imposes criminality. 31 *C. J.* 694. That they are not essential elements of the crime of manslaughter or murder in such a case as this is established by what seems to be the decided weight of authority, and for purposes of illustration we will refer to some of the cases in which the question has been discussed.

One of the earliest, if not the earliest case, in which the question arose in this country was *Commonwealth v. Webster*, 5 Cush. 296, where the indictment alleged that the murder charged had been committed "in some way and manner, and by some means, instruments and weapons, to the jurors unknown." After a very careful analysis of the English and American cases and text books, the court held that statement sufficient. In *State v. Verrill*, 54 Me. 408, the court followed *Commonwealth v. Webster, supra,* in passing upon the validity of a statute which provided that: "In any indictment for murder it shall not be necessary to set forth the manner in which or the means by which the death of the deceased was caused, but it shall be sufficient in every indict-

ment for murder to charge that the defendant did feloniously, wilfully and of his malice aforethought, kill and murder the deceased." The constitution of that state required that all the elements of or acts necessary to the crime charged in the indictment should be set out. It was contended that under that provision an indictment for murder in the language of the statute was bad, but in overruling that contention the court said: "It requires no argument to show that 'the manner in which and the means by which' a crime has been committed, are no part of the crime itself. The means by which a thing is accomplished, from the very nature of the case, cannot be the thing itself. The way which leads to the end cannot be the end. There are cases where an act may be criminal or otherwise, according to the circumstances under which it is done. If made criminal by the circumstances, then they become constituent elements of the crime and must be set out. Otherwise they are not a part of the crime and need not be set out."

In *Graves v. State*, 45 N. J. L. 358, in dealing with a similar statute, the court said: "When the legislature, commendably simplifying the form of the indictment, provided that in charging the crime it should not be necessary to set forth the manner in which or the means whereby the death was caused, but that it should be sufficient to charge that the defendant wilfully, feloniously and of his malice aforethought, killed and murdered the deceased, it merely provided that in a charge of murder, a crime well understood and defined in the law, it should be enough to charge the crime in language sufficient to designate it." In *State v. Noakes*, 70 Vt. 251, the court was dealing with a statute which provided that "in an indictment for murder or manslaughter, the manner in which, or the means by which, the death of the deceased was caused, need not be set forth, but it shall be sufficient in any indictment for murder to charge that the defendant did feloniously, wilfully, and of his malice aforethought, kill and murder the deceased, and in an indictment for manslaughter to charge that the defendant did feloniously kill and slay the deceased." After an exhaustive examination

of the cases relating to the question, the court, in an opinion upholding the statute, said: "There is nothing in the Constitution of Vermont which precludes the legislature from dispensing with the necessity of stating the means, manner and circumstances of the killing in an indictment for homicide."

In *Rowan v. State,* 30 Wis. 150, the court, in referring to a similar statute, said: "The particular instrument or means used to produce death are not stated, and the law renders it unnecessary. The means by which a homicide is committed may be material in determining the grade of the crime, but they can hardly be said to constitute an essential part of 'the nature and cause of the accusation.' * * * The means or method by which death was produced, could not always be proven as laid in the indictment, and sometimes the variance was held to be fatal. It was doubtless to avoid the consequences of a variance and for the purpose of dispensing with many useless averments in the old forms of indictment, that the legislature prescribed the forms found in this enactment. We can really see no substantial objection to this legislation." In *Williams v. State,* 35 Ohio St. 176, in referring to the history of the form of indictment for manslaughter by the statutes of that state, it was said: "In 1869, the legislature, without any change in the language of that statute, provided, in the code of criminal procedure (66 Ohio Laws 301) that, 'in an indictment for manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death was caused; but it shall be sufficient to charge that the defendant did unlawfully kill and slay the deceased.' This section was borrowed from the statute, 24 and 25 Vict., c. 100, par. 6, which provided, furthermore, that in an indictment for murder it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient to charge that the defendant did feloniously, wilfully, and of his malice aforethought, kill and murder the deceased; and the approved precedents of indictments for murder and manslaughter, under the English statute, are in the brief terms indicated in the section. *Archibald's Cr. Pl.* (17th Ed.), 620,

656. See also 8 Am. Ed., vol. 1, p. 725." To the same effect are *State v. Hosmer,* 72 Or. 57; *Commonwealth v. Jordan,* 207 Mass. 259.

In the case of *State v. Schaefer,* 96 Ohio St. 215, the State claimed that the accused, while operating a motor vehicle at a high rate of speed over a crowded village street, ran over and killed a child, and he was indicted for manslaughter. The defendant objected that the indictment, which was in the following form: " 'That E. E. Schaeffer did unlawfully kill Adelbert Chaky, sometimes otherwise known as Buley Csaki, then and there being,' etc."—did not set out facts sufficient to constitute the crime of manslaughter, but the objection was overruled and the indictment sustained, as sufficient under a statute prescribing that short form. The Supreme Court of Idaho in *State v. Smith,* 25 Idaho 541, held such an indictment bad because it failed to show the means by which death was accomplished, but the same court, in the very carefully considered case of *State v. Lundhigh,* 30 Idaho 365, overruled the earlier case, and on the authority of the statute in force in that state sustained an indictment in short form similar to that prescribed by Code, art. 27, par. 563.

In *State v. McComb,* 33 Wyo. 346, Lavoyle Duggins was struck and killed by an automobile driven by the accused and indicted in short form as follows: "Did then and there wilfully and unlawfully kill one Lavoyle Duggins, the said Lavoyle Duggins being then and there a human being." Defendant contended that that was insufficient, although authorized by the statute, but the court, referring to that statutory provision, said: "That provision was probably taken from Ohio, and an information like that in the case at bar has been held sufficient in at least three different cases decided by the Supreme Court of that state. *Wolf v. State,* 19 Ohio St. 248; *Williams v. State,* 35 Ohio St. 175; *State v. Schaeffer, supra.* The aforegoing assignment of error should, we think, be overruled."

Without further laboring the point, it is sufficient to say that, in our opinion, Code, art. 27, sec. 563, is a valid enact-

ment, and that unless vitiated by the addition of the word "negligently" the indictment was sufficient. And in respect to the effect of adding the word "negligently" to the statutory form, it may be said that, while it is not found in the statutory form, it is not inconsistent with it, and certainly did not lessen the information which the indictment would have afforded had it been omitted. Because the allegation is "feloniously and negligently," and if negligence was the basis of the charge, it must have been gross or criminal negligence, because no other degree of negligence would have been felonious, and we cannot therefore see how the validity of the indictment was affected by the addition of that word, and in our opinion the demurrer to it was properly overruled.

It is next urged that the court erred in not continuing the case on the ground that the State did not furnish the accused with a bill of particulars in time to permit him to prepare his defence. There are several answers to that objection, but it is sufficient to mention one, that the record contains no bill of exceptions presenting the question, and the docket entries fail to show that any motion to continue on that ground was made in the trial court.

The next objection is that defendant was injured by the action of the court in refusing a motion to discharge the jury and continue the case after the assistant state's attorney had stated to the jurors, who afterwards heard the case, that the appellant and one Jerry Jones, jointly indicted with him, were "hit and run drivers." That statement was made before the panel was completed, and amounted to an assertion by the State's officer that the two men were guilty, although the trial had not even begun and no evidence of any kind had been offered. It would be hard indeed to imagine anything more likely to injure the accused than such a statement, or one more hostile to the spirit of fair, impartial and impersonal justice, which in theory at least characterizes our system of criminal jurisprudence, and there was error in that ruling. But while that is true, the defendant waived his objection to it when he subsequently announced that the panel of jurors which heard his case was satisfactory to him. Un-

less they were prejudiced or influenced by the remark, he was not injured, and when he had an opportunity of having an entirely new panel, but refused it and elected to take the the panel the members of which had heard the remark, he cannot now be heard to say that they were prejudiced or unfair, and, while there was error in the ruling involved in the exception, defendant by accepting the panel when he could have had a new one admitted that it occasioned no injury, and it is not reversible.

The second and third exceptions relate to the refusal of certain questions asked in the cross-examination of Harry Blanquet, who had testified as to the collision, the speed of the car, the condition of the street, and the weather. The questions called for a mere speculative and conjectural opinion on the part of the witness, there appears to have been no reason why they should have been allowed, and we find no error in these rulings. Among those who witnessed the accident were Joseph K. Simms and his daughter, a Mrs. Schmidt, who appear to have been in the same car. Simms testified that just as the accident occurred Mrs. Schmidt cried out: "Oh, he ran right over that man." Defendant objected to that statement on the ground that it was hearsay. While the statement was obviously involuntary and spontaneously made under the spur and shock of the accident, it was nevertheless the statement of a mere bystander, but, assuming without deciding that it was hearsay, its admission could not have injured the defendant. Witness did not say defendant ran over the person who was killed, but as somebody certainly did, the statement of an obvious and conceded fact was not injurious.

The fifth exception, however, is more substantial. After the testimony referred to in the preceding exception had been given, the following occurred in the examination of the same witness: "Q. Yes. Now, did she say at that time, anything about the number of the car? A. Yes, sir. Q. What did she say? * * * (By the witness): She said 'Get his number.' (Question by Mr. Maynard) Q. Yes? A. And she wound down the window on the right side of my care and said

'1-1-6-4—1-1-6-4 and I think a 9.'" That testimony was clearly hearsay and should not have been admitted. It was admitted, of course, on the theory that it was a part of the *res gestae*, but such a conclusion ignores the obvious and elemental difference between hearsay and statements made as part of the *res gestae*. Her first statement was an involuntary exclamation of horror, induced by the shock of seeing a human being run over and possibly fatally injured by an automobile, her second statement was the result of a voluntary investigation made by her for the purpose of ascertaining the identity of the person owning or driving the automobile which caused the injury, and her announcement of the result of her investigation was pure hearsay. Her statement did not relate to the accident, but was a narrative of what she had discovered after the accident. *Jones on Evid.*, par. 345, *et seq.* But since the record does not show how that ruling injured the defendant, we can not treat the error as reversible.

The sixth and seventh exceptions relate to the action of the court in permitting two witnesses, who were experienced automobile drivers, to give their estimate of the speed at which the automobile which struck Mr. Powell was traveling at the time of the collision. Those rulings were in accord with *Kiteralis v. State*, 144 Md. 84, as well as the weight of authority elsewhere, and are free from error. 22 *C. J.* 569.

Neusbaum took the stand in his own defence. His direct testimony was brief. He gave his residence, occupation, business hours, and place of business; told who the members of his family were, but he appears to have made no reference whatever to the accident, further than to say that at ten or fifteen minutes past eleven on the night of the accident he left St. Agnes' Hospital and that he and a "Mr. Merry Jones" were jointly buying a Packard roadster. But on his cross-examination he was asked this series of questions: "Now, come on now, and tell these gentlemen of the jury why you bought this high-powered car with an open rumble seat in the rear? A. Well, it is nothing more than a pleasure

car. Q. Nothing more than a pleasure car? A. No, sir. Q. You did not buy it for the purpose of rum-running, did you?" An objection to the last question was overruled, and the witness answered "No, sir." Continuing the cross-examination, the cross-examiner appears to have assumed that Neusbaum had not told his partner about the car, and the witness, although he had said that he had told his partner about the car, was asked: "Now, wasn't it because you thought your partner would object to your buying this car and using it as you did? A. What is that? Q. Wasn't it because you knew that Mr. McHardy would object to your buying this car and using it for the purpose, using it for the purpose for which you did use it?" The defendant also objected to that question, but the objection was overruled, and he answered: "That is the only reason it was. It was just for pleasure."

These rulings are the subject of the eighth and ninth exceptions. Those questions were not only objectionable but highly improper. They were wholly irrelevant to any issue in the case, and if they had any purpose except to prejudice the jury against the defendant on a wholly collateral and independent issue not involved in the case, the record does not disclose it.

In *Nelson v. Seiler,* 154 Md. 72, counsel for the plaintiff, against the ruling of the court, persisted in asking a series of objectionable questions, and although the court in that case instructed the jury to disregard excluded evidence, it was held that there was error in overruling a motion to withdraw a juror and continue the case. In passing upon the refusal of the court to grant the motion, Judge Bond for this court said: "Generally, the choice of measures to protect the fair, unprejudiced, working of its proceedings is left to the discretion of the trial court, and only in exceptional cases will its choice be reviewed in this court. In the greater number of instances the injection into a trial of matter other than that involved in the issue to be decided is cured by withdrawal of it and an instruction to the jury to disregard it, but there may, of course, be instances in which it would not be

cured in this way, and terminating the trial and taking the case up afresh before another jury would be the only adequate means of correction. Those instances are exceptional, but they do arise."

This case differs from that in that in this case the court permitted the objectionable questions, while in that case it overruled them, and that there there was a motion for a continuance, but here there is none, but the question comes up directly upon the rulings of the court in allowing the questions. But the same reasons which supported the decision in that case lead us to the conclusion that the action of the court in allowing the objectionable questions involved in these two exceptions was injurious to the defendant, notwithstanding the fact that he denied the insinuation which they conveyed.

The defendant was charged with a crime of great gravity, the killing of a human being upon a public highway through his criminal negligence in the management of an automobile. The only issue before the court was whether he had committed that crime, and as a matter of right he was entitled to have the evidence restricted to that issue. That is to say, he was not to be convicted of one crime if he did not commit it, because he may have committed another not charged in the indictment. The attorney for the State, although the defendant had denied that he had bought the car for "rum running" purposes, in the question involved in the eighth exception was allowed to assume as a fact that defendant had used the car for some purpose which his partner regarded as objectionable, and in connection with his preceding question the manifest insinuation was that that purpose was "rum running." From those rulings the jury may well have inferred (1) that if they believed that Neusbaum had bought the car for "rum running" purposes, that that fact tended to prove that he was guilty of the crime with which he was charged, and (2) that they were permitted to infer that he was guilty of rum running from the fact that the questions were allowed in that form.

Defendant was further asked on cross-examination whether he had not, whilst under arrest, communicated with his attorney, and that inquiry was permitted over objection. The purpose of these questions, which are the subject of the tenth and eleventh exceptions, is not disclosed by the record. But in any event they could not possibly have injured the appellant, and we find no reversible error in these rulings. But for the errors involved in the eighth and ninth exceptions it will be necessary to reverse the judgment from which this appeal was taken.

*Judgment reversed.*

URNER, J., dissents.